## John W. and Melinda H. Bull v. Pinkham Engineering Assocs., Inc.

[752 A.2d 26]

No. 98-431

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed April 21, 2000

*James W. Runcie* of *Ouimette & Runcie*, Vergennes, for Plaintiffs-Appellees.

*Michael B. Clapp*, Burlington, for Defendant-Appellant.

**Skoglund, J.** This appeal concerns a lawsuit in which landowners allege that the engineering firm they hired breached its duty to properly survey their proposed residential subdivision, thereby causing them to incur legal fees in a related lawsuit and to lose an opportunity to develop a portion of their property. Following an evidentiary hearing, the superior court awarded plaintiffs John Bull and Melinda Hinsdale (formerly Bull) $55,000 in lost profits and $15,391 in attorney's fees and expenses for defending the prior

related claim. Defendant Pinkham Engineering Associates, Inc. appeals that judgment, arguing that (1) plaintiffs' claims are barred by the three-year statute of limitations governing actions seeking compensation for damages to personal property; (2) the record does not support the trial court's findings concerning the contractual duty owed by defendant to plaintiffs and the amount of damages caused by defendant's conduct; and (3) the doctrine of collateral estoppel bars plaintiffs from claiming that defendant's survey was incorrect. On cross-appeal, plaintiffs claim that they are entitled to prejudgment interest on their damage awards. We affirm the trial court's decision, except that we grant plaintiffs' request for prejudgment interest on the award of attorney's fees.

The trial court made the following findings. In 1986, plaintiffs bought a farm in Ferrisburgh, Vermont. Shortly thereafter, they began to look into the possibility of subdividing a portion of the farm for the development of residential lots. They enlisted the help of Mrs. Bull's brother, Clark Hinsdale, a licensed real-estate broker who had experience in subdividing and developing property. They decided to develop thirty-five acres located on the westerly portion of the farm, a woodland area with little or no agricultural value. Mr. Hinsdale prepared a preliminary sketch laying out fifteen lots for a subdivision to be called Steeplewood. The sketch, which was based on the Ferrisburgh tax map, indicated that the southern boundary of the subdivision coincided with the southern boundary of plaintiffs' property; however, the tax map (and therefore the sketch) incorrectly located the southern boundary of plaintiffs' land a few hundred feet to the north of the actual boundary.

Upon Mr. Hinsdale's recommendation, plaintiffs hired defendant to do the surveying and engineering work for the subdivision. When Mr. Young, defendant's chief of surveying, indicated that it would be helpful to be able to refer to surveys of adjoining lands, Mr. Hinsdale provided defendant with copies of the surveys of properties to the west owned by Cutting and to the north owned by Pickett. Mr. Hinsdale told Mr. Young that there was no need for defendant to resurvey the property lines between the Bull property and the Cutting or Picket properties. Mr. Hinsdale never asked defendant to complete a perimeter survey of the Bull property.

In preparing its survey of the Steeplewood subdivision, defendant based all of the bearing references on references in the Pickett and Cutting surveys, yet did not indicate on the Steeplewood survey that it had done so. Nor did defendant independently verify the accuracy

of the bearings contained in the prior surveys, even though it would have taken only a matter of minutes to do so. As a result, all of the bearings on the Steeplewood survey were off by approximately eight and one-half degrees.

Nor did defendant survey the southern boundary of the proposed subdivision to determine whether the sketch taken from the Ferrisburgh tax map accurately depicted the location of that boundary. In fact, as noted, the tax map and sketch inaccurately depicted the southern boundary of the subdivision (and plaintiffs' property) a few hundred feet to the north of the actual boundary.

Plaintiffs and Mr. Hinsdale proceeded to implement the subdivision plan in three phases. In late 1989 or early 1990, after the first two phases were complete, plaintiffs decided to go ahead with phase three, which involved the preparation and sale of lots five, seven, and eight. In April 1990, Mr. Hinsdale asked defendant to stake out the center line of an east-west road running through the subdivision and set the corner pins for the phase three lots. Contrary to what it had done in the two earlier phases of the development, defendant set only the corner pins adjacent to the road and did not mark the rear corners of the lots. Nor did defendant inform plaintiffs or Mr. Hinsdale that the rear corner pins for the three lots had not been set.

In the spring of 1991, Mr. Hinsdale discovered that defendant had still not set the rear corner pins of the phase three lots. After advising Mr. Young that the pins had not been set, Mr. Hinsdale reasonably expected defendant to do so. In July 1991, plaintiffs sold lot five to William and Geraldine Burke. After purchasing the lot, Mr. Burke notified plaintiffs that he could not find the pin marking its northeastern corner. Mr. Bull and Mr. Hinsdale spent three hours trying to locate the pin by compass, but were unable to do so. Mr. Hinsdale then telephoned defendant to report that he could not locate the pin. When Mr. Hinsdale was informed that the pin had not been placed yet, he requested that it be set immediately.

Some time before September 11, 1991, the date defendant finally set the pin, Christopher Hastings, the contractor hired by the Burkes to build their home, poured a foundation for the house. Because the northeastern corner marker had not been set, Mr. Hastings attempted to locate the easterly boundary by taking a bearing from the southeastern corner of the lot. Because defendant's survey was off by eight and one-half degrees, the line the contractor determined for the eastern boundary was incorrect, and part of the foundation was located beyond the boundary line separating lots five and seven. After

discovering the error, the Burkes halted construction of the house, which was never completed.

In December 1991, the Burkes filed suit against plaintiffs, Mr. Hastings, and defendant. They alleged that (1) plaintiffs were negligent in failing to cause the northeastern boundary pin to be put in place in a timely manner; (2) the incorrect compass bearing in their warranty deed for lot five constituted a breach of warranty; (3) defendant negligently identified an incorrect compass bearing on the eastern boundary of lot five; and (4) Mr. Hastings negligently placed the foundation of their house. After a jury trial, the superior court directed a verdict for all defendants on all counts. The court ruled that the first count failed as a matter of law because no testimony was presented as to the cost of repair or the diminution in value of the property. The court held that the second count also failed as a matter of law because the compass bearings for the subdivision were internally consistent and thus correct for purposes of conveying the title to lot five. A three-justice panel of this Court affirmed the decision. See *Burke v. Bull*, No. 94-432 (August 4, 1995) (mem.).

In February 1996, plaintiffs brought suit against defendant, seeking to recover the legal costs they incurred in defending against the Burke complaint, and the damages resulting from their lost opportunity to include within the Steeplewood subdivision their land located to the south of the southern boundary of the subdivision as depicted on defendant's survey. Following an evidentiary hearing, the superior court awarded plaintiffs $15,391 for legal costs associated with defending the Burke complaint and $55,000 for lost development opportunities. Defendant appeals, raising several issues, and plaintiffs cross-appeal, arguing that the court erred in failing to grant prejudgment interest on their damage awards.

As an initial matter, we emphasize our standard of review. We will not set aside the trial court's findings unless they are clearly erroneous, and we will uphold the court's conclusions as long as they are reasonably supported by the findings. See *Morgan v. Kroupa*, 167 Vt. 99, 104, 702 A.2d 630, 633 (1997). Findings are viewed in the light most favorable to the judgment, disregarding modifying evidence, and will not be disturbed merely because they are contradicted by substantial evidence; rather, an appellant must show that there is no credible evidence to support them. See *Bianchi v. Lorenz*, 166 Vt. 555, 562, 701 A.2d 1037, 1041 (1997).

## I. Lost Profits

### A. Statute of Limitations

Defendant first contends that plaintiffs' claim for lost profits is barred by 12 V.S.A. § 512(5), which provides that an action for damage to personal property caused by the act or default of another must be commenced within three years after the cause of action accrues. According to defendant, § 512(5) governs because the nature of the claimed harm is the relevant inquiry, and in this case the nature of the harm is plaintiffs' loss of cash, which is personal property. We find no merit to this argument.

Plaintiffs' claim for lost profits stemming from defendant's alleged breach of its contractual duty cannot be construed as claim for damage to personal property. Therefore, the claim is governed by 12 V.S.A. § 511, the "catchall statute that applies to civil actions generally." *Fitzgerald v. Congleton*, 155 Vt. 283, 287, 583 A.2d 595, 598 (1990). In cases such as this, where there is no claim of damage to personal property, we have held that § 511 applies to actions seeking damages for economic loss, including loss stemming from injury to real property. See, e.g., *Investment Properties, Inc. v. Lyttle*, 169 Vt. 487, 494, 739 A.2d 1222, 1228 (1999) (§ 511 governs indemnity action seeking money damages resulting from defective flooring in condominiums); *Congdon v. Taggart Brothers, Inc.*, 153 Vt. 324, 325, 571 A.2d 656, 657 (1989) (§ 511 governs action against builder for damages resulting from fire allegedly caused by negligent design and construction of building); *Alpstetten Ass'n v. Kelly*, 137 Vt. 508, 513, 408 A.2d 644, 646 (1979) (§ 511 governs claim alleging tortious act resulting in interference with use and enjoyment of real property); *Union School District No. 20 v. Lench*, 134 Vt. 424, 425, 365 A.2d 508, 509 (1976) (§ 511 governs claim against architect for economic loss resulting from negligent repair of roof); cf. *Stevers v. E.T. & H.K. Ide Co.*, 148 Vt. 12, 13, 527 A.2d 658, 659 (1987) (§ 512(5) governs claim alleging that insecticide killed one cow and injured others).

Defendant correctly states that it is the nature of the harm done, rather than the plaintiff's characterization of the cause of action, that determines which statute of limitations governs. See *Fitzgerald*, 155 Vt. at 288, 583 A.2d at 598. Here, plaintiffs incurred economic loss as the result of not being able to develop two additional lots on their property. The nature of the harm done is the diminution of the value of their real property rather than damage to personal property. Accordingly, the claim is governed by the six-year statute of

limitations contained in § 511. If we were to accept defendant's reasoning that cash is personal property, and thus any claim of economic loss is subject to § 512(5), then virtually all contract actions would be subject to a three-year statute of limitations, contrary to established law.

Defendant asserts, however, that even if § 511 governs, plaintiffs' cause of action accrued in 1987, when plaintiffs received defendant's survey and were put on notice of its defects. See *University of Vermont v. W.R. Grace & Co.*, 152 Vt. 287, 290-91, 565 A.2d 1354, 1357 (1989) (cause of action governed by § 511 accrues when plaintiff discovers, or through reasonable diligence should have discovered, injury). We disagree. Defendant failed to meet its burden of proving that the six-year limitations period expired before plaintiffs initiated their lawsuit. See V.R.C.P. 8(c) (statute of limitations is affirmative defense); *Monti v. Granite Savings Bank & Trust Co.*, 133 Vt. 204, 209, 333 A.2d 106, 109 (1975) (defendant has burden of establishing statute-of-limitations defense). Although the trial court declined to make a finding on when the Bulls knew or should have known that the southern boundary depicted on defendant's survey was inaccurate, the evidence indicated that not until after July 1991, when the problems with the Burke lot arose, did plaintiffs suspect that the southern boundary depicted on the survey (as well as the tax map and Mr. Hinsdale's original subdivision sketch) might not accurately reflect the actual southern boundary of their property. See *Capital Candy Co. v. Savard*, 135 Vt. 9, 12, 369 A.2d 1361, 1362 (1976) (trial court's inability to make finding on issue is equivalent of making finding against party with burden of proof on issue).

■ At best, from defendant's perspective, the evidence indicated that sometime in 1991 Mr. Bull observed the southern boundary of the subdivision in the field and recognized that it was located north of the actual southern boundary line of his property. Further, notwithstanding defendant's assertions to the contrary, none of the evidence at trial demonstrated that plaintiffs acted unreasonably in assuming, until that time, that defendant's survey accurately depicted the southern boundary of their property. Given that plaintiffs' lawsuit was filed within six years of 1991, it was not barred by § 511.

## B. Breach of Duty

Defendant next claims that the trial court erred in concluding that the engineering firm owed plaintiffs a duty to verify the southern

boundary of their property. Defendant reasons as follows. Plaintiffs, not defendant, established the outer boundaries of the proposed subdivision, as depicted on Mr. Hinsdale's preliminary sketch. Because plaintiffs never specifically asked defendant to verify those outer boundaries, the firm's only duty was to make an accurate survey of the lots within the subdivision boundaries established by plaintiffs. Because the survey was internally consistent, defendant did not breach its duty to plaintiffs. This argument is neither persuasive nor supported by the record.

The trial court made undisputed findings that (1) the preliminary sketch of the proposed subdivision provided to defendant by Mr. Hinsdale indicated that the subdivision's southern boundary was to coincide with the southern boundary of plaintiffs' property; (2) defendant knew that the preliminary sketch was based upon the Ferrisburgh tax map; (3) tax maps are not intended to be used in establishing the boundaries on any survey, and it would not be in accordance with professional surveying standards to do so; (4) the physical characteristics of plaintiffs' property should have indicated to defendant that the tax map (and therefore the sketch) might not have accurately depicted the southern boundary of the property; (5) without attempting to verify the accuracy of the southern boundary of the proposed subdivision, or stating on its survey that the bearings indicated therein were based exclusively on other unverified surveys, defendant used the tax map to guess at the location of the southern boundary line of the property (and thus the subdivision).

The trial court also found that professional survey standards require that a survey must verify the perimeter boundaries of the parcel to be surveyed. Defendant contends that this finding cannot stand because plaintiffs failed to present expert testimony to support it. In response, plaintiffs point to testimony indicating that defendant was aware that preparing an accurate survey required researching the deeds of adjoining owners to verify the perimeter boundaries of the land to be surveyed.

■ Given the nature of a survey, see Black's Law Dictionary 1296 (5th ed. 1979) (defining "survey" as process by which "land is measured and its boundaries and contents ascertained"), we doubt that expert testimony is required to support the challenged finding. See *Estate of Fleming v. Nicholson*, 168 Vt. 495, 497-98, 724 A.2d 1026, 1028 (1998) ("Where a professional's lack of care is so apparent that only common knowledge and experience are needed to comprehend it, expert testimony is not required to assist the trier of fact in

finding the elements of negligence."); cf. *Hostetler v. W. Gray & Co.*, 523 So. 2d 1359, 1368 (La. Ct. App. 1988) (engineering company breached duty owed to purchasers of lot by relying on previous preliminary topographical survey to determine location of easement without independently verifying accuracy of survey). In any event, we need not decide this issue because the unchallenged findings cited above, even when not bolstered by the challenged finding, support the trial court's conclusion that defendant breached its duty to use reasonable care in surveying the proposed subdivision. See *Peckham v. Peckham*, 149 Vt. 388, 390, 543 A.2d 267, 269 (1988) (erroneous nonessential finding does not require reversal); see also *Peters v. Mindell*, 159 Vt. 424, 429, 620 A.2d 1268, 1271 (1992) (every contract includes implied duty to perform with care, skill, reasonable expedience, and faithfulness); *Thompson v. Green Mountain Power Corp.*, 120 Vt. 478, 485, 144 A.2d 786, 790 (1958) ("Foreseeable consequences may be significant in the determination of the scope of legal duty and whether a duty of care has been violated.").

## C. Damages

Next, defendant contends that the evidence does not support the court's conclusion that plaintiffs were entitled to $55,000 in lost profits as the result of not being able to develop their land located to the south of the southern boundary of the subdivision depicted in defendant's survey. Again, we disagree. Mr. Bull testified at trial that after the sale of lots fourteen and fifteen — the two southernmost lots depicted on the survey — plaintiffs' land located to the south of those lots could not be developed into two additional lots because there was no longer any access to them. He also testified that the isolated parcel could not be reached from, and was of no value to, the main farm. Defendant did not contest this evidence at trial. Based on Mr. Bull's unchallenged testimony, the trial court found that there was no access for possible development of plaintiffs' land south of the subdivision.

Defendant asserts on appeal that the isolated parcel can be accessed by building another road outside the subdivision, and thus the court should have calculated the damages based on the increased cost in developing the parcel independently of the Steeplewood subdivision. We conclude that this argument was not properly preserved. As noted, plaintiffs presented uncontested evidence that there was no access to the parcel after lots fourteen and fifteen were sold. Defendant did not cross-examine plaintiffs or present its own testimony on this point, even though it had the burden of showing that

plaintiffs could have mitigated their damages. See *Cartin v. Continental Homes of New Hampshire*, 134 Vt. 362, 367, 360 A.2d 96, 100 (1976) (while there is general duty to mitigate damages, burden of showing that mitigation could have been accomplished is on party asserting it). In its response to plaintiffs' proposed findings, defendant made the following singular statement: "The Bulls could access the area in question through their property facing on Dakin Farm Road." Apart from an exhibit indicating the existence of this road, the record contains no evidence supporting this statement.

■ We do not believe that defendant's single statement following completion of the four-day evidentiary hearing adequately preserved for appeal its argument that plaintiffs' damages for lost profits should be limited to the difference between the profit plaintiffs would have realized had they developed the area in question as part of the subdivision, and the profit they would have realized had they developed the property independently after discovering that defendant's survey was incorrect. Contentions not raised or fairly presented to the trial court are not preserved for appeal. See *Lanphere v. Beede*, 141 Vt. 126, 129, 446 A.2d 340, 341 (1982); *Monti v. Town of Northfield*, 135 Vt. 97, 99, 369 A.2d 1373, 1376 (1977) (matters raised for first time on appeal are not considered on appellate review). In order to effectively raise an objection, a party must present the issue with specificity and clarity in a manner that gives the factfinder a fair opportunity to rule on it. See *State v. Ringler*, 153 Vt. 375, 378-79, 571 A.2d 668, 670 (1989). Having failed to do so here, defendant has waived any right to raise the issue for the first time on appeal. Moreover, even if we were to consider the issue, defendant plainly failed to meet its burden at trial of showing that plaintiffs could have mitigated their damages.

## II. Costs of Defending Previous Action

### A. Statute of Limitations

■ As with the lost-profits claim, defendant argues that plaintiffs' claim for defense costs was barred by the three-year statute of limitations contained in 12 V.S.A. § 512(5). We reject this argument for reasons similar to those stated earlier with respect to the claim for lost profits. Here, the nature of the injury is loss of money — specifically, attorney's fees — due to defendant's failure to properly survey plaintiffs' real property. Thus, once again, the nature of the injury is not damage to personal property, and the three-year statute

of limitations is not applicable. See *Fitzgerald*, 155 Vt. at 293, 583 A.2d at 601 (six-year statute of limitation governs claim seeking reimbursement from attorney for costs associated with securing return of child). As we stated before, if we were to consider every award of money damages to constitute damage to personal property, irrespective of the source of the damages, then all contract actions would be subject to a three-year statute of limitations, contrary to established law.

## B. Proximate Cause

Defendant next claims that the court erred in concluding that the engineering firm's wrongdoing was a proximate cause of plaintiffs incurring legal costs to defend the first count of the Burke complaint, which alleged that the Bulls were negligent in failing to cause a marker to be placed in the northeastern corner of the lot they sold to the Burkes. We find no merit to this argument. The evidence indicated that (1) in April 1990, approximately fifteen months before the Burkes purchased their lot from plaintiffs, plaintiffs asked defendant to set the pins for the phase three lots, including lot five; (2) plaintiffs and Mr. Hinsdale reasonably assumed that defendant put the pins in place in May 1990 and then again in the spring of 1991; (3) in July 1991, when the Burkes reported that they could not find the northeastern corner pin on their lot, Mr. Hinsdale and Mr. Bull searched for the pin without success; (4) Mr. Hinsdale called defendant and was informed that the pin had not yet been set; (5) Mr. Hinsdale informed defendant that the pin needed to be placed; (6) the pin was not placed until September 11, 1991; (7) some time between July and September 1991, Mr. Hastings poured a foundation for the Burkes' house; and (8) when defendant finally set the northeastern corner pin for the lot five on September 11, 1991, it became clear that Mr. Hastings had extended the foundation onto an adjoining lot. Given these facts, the trial court correctly concluded that plaintiffs' defense costs were proximately caused by defendant's wrongdoing.

■ Seizing upon the trial court's observation that this is not a true indemnity case because the Burkes did not prevail in their suit against the Bulls (and thus the Bulls were not legally obligated to the Burkes), defendant argues that plaintiffs are not entitled to costs incurred in contesting a count alleging that they, and not defendant, were negligent. Again, this argument has no merit. "There is a substantial body of case law which holds that where the wrongful act

of one person has involved another in litigation with a third person or has made it necessary for that other person to incur expenses to protect his interests, litigation expenses, including attorney's fees, are recoverable." *Albright v. Fish*, 138 Vt. 585, 591, 422 A.2d 250, 254 (1980); accord *Wyatt v. Palmer*, 165 Vt. 600, 602, 683 A.2d 1353, 1356-57 (1996) (mem.). Regardless of whether indemnity is the correct label for this action, Vermont law entitles plaintiffs to seek compensation for their loss, and, without question, a proximate cause of that loss was defendant's wrongdoing. If not for defendant's wrongdoing, plaintiffs would not have incurred legal costs in defending against the Burke lawsuit.

### C. Collateral Estoppel

Defendant also asserts that the doctrine of issue preclusion bars plaintiffs from recovering their costs related to defending count two of the Burke suit, a breach-of-warranty claim. The Burkes claimed that they did not receive good title to their lot because the survey that defendant had performed for the Bulls erroneously identified the compass bearing for the eastern boundary of the lot. According to defendant, the doctrine of collateral estoppel precludes plaintiffs from recovering costs in defending against this claim because in the Burke case plaintiffs argued, and the trial court ruled, that the bearing reference was correct.

This argument is not persuasive. Collateral estoppel, or issue preclusion, bars the subsequent relitigation of an issue that was actually litigated and decided in a prior case between the parties, so long as there was a final judgment on the merits and the issue was necessary to resolution of the action. See *Longariello v. Windham Southwest Supervisory Union*, 165 Vt. 573, 574, 679 A.2d 337, 338 (1996) (mem.); *American Trucking Ass'ns v. Conway*, 152 Vt. 363, 370, 566 A.2d 1323, 1328 (1989). The elements of issue preclusion are the following:

> (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990).

Here, at least two of the five elements are not met. First, the issues in the two cases are not the same. In the Burke litigation, the issue was whether the Bulls had breached the warranty of title. In holding that they had not, the superior court stated that the bearings in the survey were "internally consistent" and thus correct "for the purposes of [transferring] title." Therefore, the Burkes received title to the property shown as lot five on the Steeplewood survey, and no breach of warranty occurred. In contrast, at issue in the present action is whether the bearing is incorrect in relation to magnetic north, and whether that error led to the expenses incurred by plaintiffs in the Burke litigation. Because the issues in the two cases are not the same, collateral estoppel does not apply. See *American Trucking*, 152 Vt. at 369, 566 A.2d at 1327-28.

Second, plaintiffs did not have a full and fair opportunity in the Burke proceedings to litigate the principal question at issue in the instant case. In determining whether collateral estoppel should apply, courts must look to the circumstances of each case, including, among other things, the incentive for the party (against whom estoppel is claimed) to litigate the issue. See *State v. Stearns*, 159 Vt. 266, 269-70, 617 A.2d 140, 141-42 (1992); *Trepanier*, 155 Vt. at 265, 583 A.2d at 587. Here, plaintiffs had no incentive to convince the factfinder in the Burke litigation that the bearings on lot five as depicted in defendant's survey were incorrect in relation to magnetic north. The only fair and reasonable way for plaintiffs to litigate this issue in the context of the Burke litigation was to file a cross-claim against defendant. They did so, raising essentially the same allegations that they make in the instant action. By stipulation, defendant and plaintiffs agreed to dismissal of the claim in the Burke litigation *without* prejudice. Collateral estoppel does not bar plaintiffs' claim here.

## D. Allocation of Defense Costs

Defendant's final argument is that the court's award of $15,391 in legal fees associated with the first two counts of the Burke litigation is based on hearsay evidence and is otherwise unsupported by the record. At trial, plaintiffs submitted an exhibit that included all of the legal bills that they incurred in defending against the Burke lawsuit. The first two pages of the exhibit summarized the bills and allocated the expenses attributable to the first two counts of the Burke complaint. Defendant objected only to those first two pages of the

exhibit, arguing that they were inadmissible under the hearsay rule because plaintiffs' attorney was not a witness and was not available for cross-examination. Defendant makes the same argument here, further contending that, absent the two pages allocating defense costs, the court's award is unsupported by any evidence and thus cannot stand.

We find no abuse of discretion. The attorney for the Hinsdales, co-defendants in the Burke litigation, testified that plaintiffs' attorney was conservative in allocating defense costs attributable to counts one and two of the Burke complaint, given that at least seventy-five percent of the Burke trial concerned defendant's negligence in preparing the survey and its failure to place the northeastern corner pin on lot five in a timely manner. As for pretrial costs, the bills for legal services received after the Burkes added additional counts to their complaint indicated what fees were attributable to which counts. In short, even excluding the first two pages of the exhibit, the court's award is amply supported by the bills entered into the record, the testimony of the attorney for the Hinsdales, and the transcript from the Burke proceedings.

### III. Prejudgment Interest

Plaintiffs argue on cross-appeal that the trial court erred by failing to grant them prejudgment interest as a matter of right on their damage awards. In a one-page argument, they briefly assert that they are entitled to prejudgment interest because the amount of their damages was readily ascertainable on a date certain. We agree that plaintiffs' attorney's fees in the underlying action were readily ascertainable at the time that they were incurred, but we conclude that plaintiffs have failed to demonstrate that they were entitled to prejudgment interest on their award for lost profits.

"Prejudgment interest may be awarded as damages for detention of money due for breach or default. This interest is awarded as of right when the principal sum recovered is liquidated or capable of ready ascertainment and may be awarded in the court's discretion for other forms of damage." *Newport Sand & Gravel Co. v. Miller Concrete Constr., Inc.*, 159 Vt. 66, 71, 614 A.2d 395, 398 (1992). The principal rationale for awarding prejudgment interest as of right is that, where damages are liquidated or readily ascertainable, "'the defendant can avoid the accrual of interest by simply tendering to the plaintiff a sum equal to the amount of damages.'" *Agency of Natural*

464

*Resources v. Glens Falls Ins. Co.*, 169 Vt. 426, 435, 736 A.2d 768, 774 (1999) (quoting *Johnson v. Pearson Agri-Sys., Inc.*, 350 N.W.2d 127, 130 (Wis. 1984)).

We have little from the record to work with on this issue. The trial court did not indicate why it chose to deny prejudgment interest. Plaintiffs make a rather sparse assertion that the amounts of both awards are readily ascertainable, and defendant does not respond at all to their argument. We agree with plaintiffs that the amount and allocation of their attorney's fees in the underlying litigation were readily ascertainable, and thus plaintiffs have a right to prejudgment interest on that award from the time they incurred the fees. With respect to the claim for lost profits, however, plaintiffs have failed to demonstrate that they are entitled to prejudgment interest as a matter of right, and they do not argue that the trial court abused its discretion by failing to grant prejudgment interest on that award. Plaintiffs neither explain in detail how their lost profit damages were readily ascertainable, nor cite any case law discussing the propriety of awarding prejudgment interest on damage awards for lost profits. Cf. *Investors Title Co. v. Chicago Title Ins. Co.*, 983 S.W.2d 533, 538 (Mo. Ct. App. 1998) (in suit for breach of contract, prejudgment interest is generally not allowable on damage award for lost profits); *Republic Textile Equip. v. Aetna Ins.*, 360 S.E.2d 540, 545 (S.C. Ct. App. 1987) (in negligence action, prejudgment interest is generally not awarded on claims for lost profits or similar consequential losses). Given the paucity of the briefing, we make no general ruling on this point of law, but decline to disturb the trial court's decision in this case not to award prejudgment interest on plaintiffs' damage award for lost profits.

*The superior court's August 13, 1998 decision is affirmed in all respects, except that prejudgment interest is granted on plaintiffs' award for attorney's fees incurred in the underlying litigation.*